DECISION
Defendant-appellant, Rodney Jones, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of (1) attempted murder in violation of former R.C. 2923.02 as it applies to R.C. 2903.02, as well as the two accompanying specifications, and (2) felonious assault with a single specification. Defendant assigns a single error:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE "DRIVE BY" SPECIFICATION, WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THAT CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
Because the specification is supported by sufficient evidence and by the manifest weight of the evidence, we affirm.
By indictment filed August 3, 2000, defendant was charged with attempted murder with two specifications. The first specification alleged the charged felony includes "* * * as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another and that was committed by discharging a firearm from a motor vehicle other than a manufactured home. * * *" See former R.C. 2941.146(A). The second specification was a firearm specification under former R.C.2941.145. The second count charged defendant with felonious assault, also with a firearm specification, under former R.C. 2941.145.
The matter was tried to a jury that rendered guilty verdicts on all counts and all specifications. The trial court merged the convictions for attempted murder and felonious assault, and sentenced defendant to a total of ten years, excluding the sentences on the specifications. As to the specifications, the trial court imposed five years of actual incarceration on the drive-by specification. Further, the court imposed three years each on the two firearm specifications, but merged them for purposes of sentencing. Defendant appeals, contending the evidence does not support his conviction for the drive-by specification.
To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259-260, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence"). Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
According to the state's evidence, Tim Jackson had heard rumors in the neighborhood that defendant did not like him and wanted to fight him. On a night in early July, Jackson had been drinking, as had defendant. Jackson approached defendant and inquired what "was up" with the rumors. (Tr. 24.) According to Jackson, defendant "started this thing." (Id.) Jackson responded by hitting defendant and the ensuing fight lasted approximately five to ten minutes. Jackson claimed to have won the fight.
Jackson saw defendant at least one more time between then and the night of July 21, 1999. In that encounter, Jackson did not converse with defendant, but defendant "had words towards me." (Tr. 25.) More specifically, defendant was in an automobile when Jackson saw him. Defendant "told [Jackson] to wait right there, he would be back, threatened to kill me that night." (Id.) Jackson saw defendant no more that evening.
The next time Jackson saw defendant was July 21, 1999. Defendant approached in a car, spoke words to Jackson, and "backed off back down the street." (Tr. 26.) Jackson interpreted defendant's remarks as a threat. Defendant's car may have contained up to three other people at the time.
Jackson proceeded down the street, stopped to see a friend, and ultimately was back on the street heading toward his cousin's house. Jackson saw defendant again approaching in a car; defendant did not say anything. Jackson kept walking, but saw the car stop. Jackson looked, saw defendant "shooting at me and started to try to run." (Tr. 28.) As Jackson explained, "my first reaction was to kind of like run, and then I kind of turned because I seen the bullets and just trying to cover up somehow." (Tr. 55-56.) Defendant fired the shots at Jackson from the driver's seat, across the passenger, and out the passenger side window. A bullet hit Jackson in the back, leaving him paralyzed from the chest down.
By contrast, defendant testified he had never had words with Jackson before the fight. On the night of the fight, defendant was sitting on a porch when Jackson, who was clearly drunk, approached him. Without provocation, Jackson hit defendant hard enough to nearly knock defendant off the porch of the house. Defendant tried to push Jackson away, and a fight ensued that lasted for fifteen to twenty minutes. After the fight, defendant saw Jackson in the neighborhood, but tried to avoid him.
On the night of July 21, 1999, defendant was in his car with his friend, Charles Nowlin. As he turned a corner, defendant saw Jackson. Defendant slowed down to make sure it was Jackson, but did not stop. Jackson said something to defendant, but defendant could not "really make out what he was saying, pointing his fingers at me, saying something. Whatever he was saying, it was supposed to be intimidating to me." (Tr. 233.) Nowlin told defendant not to do anything, and defendant agreed: "I'm not going to do anything because he ain't going to let me talk. He is just talking." (Id.) Defendant pulled off the road, looked in his rearview mirror, and saw Jackson continuing to walk away from defendant. Defendant then parked his car and went into Nowlin's house.
On leaving Nowlin's home, defendant walked toward the alley where his car was parked. As he went to the side of the alley to get into his vehicle, he saw someone coming out of the dark part of the side of the building: "I looked as I was walking, and I seen what appeared to be Mr. Jackson approaching me from the alley." (Tr. 235.) When he realized who it was, defendant was scared and drew his "sidearm." (Tr. 236.) Defendant had not yet reached his car.
With weapon drawn, defendant told Jackson to stop. Jackson ignored defendant's command. Defendant waited, and Jackson still came toward him. Defendant believed Jackson was "under the influence of something," and saw Jackson had "reached his hand down" as he was coming toward defendant. (Tr. 238.) Because defendant thought Jackson appeared to be drawing a weapon, defendant "did a double tap, which is two-shot burst" from his firearm. (Tr. 239.) Defendant blinked when the weapon went off, and apparently during that time Jackson turned; the bullet struck Jackson in his back.
Jackson's testimony is sufficient evidence to support conviction for the drive-by shooting. While Jackson was somewhat uncertain concerning the number of passengers in defendant's car, he was specific in his testimony that defendant was in a car, had a gun, pointed the gun out the passenger side of his car, and shot at Jackson.
Although our assessing the manifest weight of the evidence permits a limiting weighing of that evidence, the discrepancies here were matters of credibility for the jury to resolve. Both defendant and Jackson testified Jackson initially was walking on the street toward defendant on the night of July 21, 1999; further, the bullet undisputedly entered defendant's back and caused the noted paralysis. Substantial differences, however, exist in the remainder of their testimony. The jury saw both witnesses testify, and heard the testimony each gave. Resolving the discrepancies in their testimony, both in the minor and significant aspects, was within the jury's province. Because a reasonable juror could believe Jackson's testimony, even in the context of the evidence defendant offered, we cannot say the jury lost its way in resolving the credibility issues and rendering verdicts in this case.
Defendant nonetheless contends that because Jackson was shot in the back, he could not have seen who shot him. Jackson testified he was approaching defendant at the time he saw defendant's gun. Indeed, defendant also testified Jackson was approaching him when defendant drew his weapon and fired. Jackson testified he turned to run when he saw defendant shooting at him; defendant testified Jackson turned as defendant fired at him. Given that under both versions of the events, Jackson was walking toward defendant, neither defendant's nor Jackson's explanation is inherently more believable than the other, and the jury reasonably chose between the two. Moreover, under either scenario, Jackson would have seen who had the gun and fired at him. Although defendant suggests it is highly implausible that defendant could fire his weapon through the passenger side window with a passenger in the car, Jackson's testimony was less than certain concerning how many people were in the car and their placement in the vehicle. Lastly, the other discrepancies in the testimony of Jackson and defendant, and in particular whether defendant was in a car, permitted the jury opportunities to exercise the jury's prerogative to evaluate and determine the credibility of the witnesses.
Accordingly, defendant's single assignment of error is overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE and PAINTER, JJ., concur.
PAINTER, J., of the First Appellate District, assigned under authority of Section 6(C), Article IV, Ohio Constitution.